May it please the court, William Cole representing the United States. This of course is a federal court claims medical malpractice action from the island of Guam. In this case, as in any other court case, there are four elements necessary to prove the claim. First, the existence of a duty. Second, a breach of that duty. Third, an injury. And finally, the matter that concerns us here today, the evidence that the breach of duty caused the injury. In this case, the plaintiffs failed to present any reliable evidence supporting the claim that there was negligence by government health care personnel which caused Mrs. Rutledge's Cauda Equina Syndrome. When you say any reliable evidence, does that mean something other than any evidence? Yes, it does. So then you do concede that the plaintiffs submitted some evidence. Yes. But you think, why wasn't it reliable? Because it was not by what you consider qualified experts? The only evidence that they presented that Mrs. Rutledge had Cauda Equina, had the condition that could have been diagnosed when she was at the government care centers, was from Dr. Toll. Let me ask you something. Is that really the question? Because it seems to me the prevented, had she had care other than what she had over those several weeks when she was presenting with rather severe symptoms. And you're assuming that there had to be proof that she had the syndrome, the full-blown earlier, as opposed to that she had a condition that had a good chance of turning into that syndrome if it wasn't treated and it wasn't treated. Let me see if I can answer both of those questions one after the other. If I may first respond to Judge Tashima. Plaintiffs themselves say that Dr. Toll's expert testimony was not presented to establish that Mrs. Rutledge had or didn't have Cauda Equina syndrome on any one of the three clinic visits. And in fact, he did not have any credentials to make a determination as to whether she had Cauda Equina syndrome. In response to Judge Berzon's question. But there was another doctor who did testify and did report to have credentials and you have to deal with him, Dr. Steele. That's right. He also did testify. But he did not testify that she had Cauda Equina syndrome, as is consistent with what I was saying, was that if they had treated her, as they should have treated her early on, then she wouldn't have had this disaster when she had it. What he testified was that if in fact she had been treated and something had been done before the time that the syndrome showed itself, then she would have been better. But that is an impossibility. It's like the treatment of anything before it appears. It, of course, would be a good idea. Just from what he testified and from what one knows about people with severe back problems, people who have severe back problems get treated for herniated discs before it turns into the syndrome. And as I understand the record, had it been treated as a herniated disc, but a serious herniated disc, it wouldn't have turned into the syndrome. Is that not right? But when he was seen at Anderson Clinic, they knew that it was a herniated disc and they thought that the best way to treat that was by rest and relaxation without taking any actions. They never told her that it was a herniated disc. Well, I know that in the judge's opinion in this case, it was stated that in fact she was told by Col. Giskolm, who was one of the treating individuals. Well, he told her on the third visit, this was the July 17th, I'm sorry, the August 17th visit, that she had a herniated disc. But she never saw a doctor. She never did see a doctor, but that's because, as you said, there are a lot of people with back problems. And in a place like the Guam Center, they felt that this was something that was being properly handled. And Dr. Steele's testimony was that that was not true. And that if they had treated her appropriately, she, so what's wrong with that as adequate expert testimony? Because Dr. Steele did not say that she had Cauda Equina Syndrome. And the court's decision here was that it was a delayed diagnosis of Cauda Equina Syndrome. That was the error. You know, this may just be semantics, but it appears that she shows up, first off, with a very odd symptom that's really quite uncharacteristic of UTI. She shows up with vaginal numbness on one side. There's a test for UTI. No surprise, as we now know, it comes back negative. She comes back a week later. The numbness has increased. It's now extended to her buttocks and leg numbness and so on. At this point, we're presented with symptoms that, I mean, I don't think you'd even challenge this, that a competent doctor would have recognized as something other than just sort of take a couple of aspirins and go home. You'll be fine. It, over time, produces this syndrome. But the allegation is that a doctor, at that early time, maybe the first visit, certainly by the second visit, should have recognized that there was a real problem. And the failure to recognize that problem and the failure to treat it timely produces the full-blown syndrome. I don't see where your argument is. That just seems to me just, that's two plus two is four. Well, one of the positions that we are relying on is actually from Dr. Steele, who said that this was a herniated disc up until the time that she had what he called the sentinel event, which was the defecation at her home. And he said, in treating that, the usual method is simply to provide bed rest, to allow the herniated disc to improve so that it does not turn into what is an extraordinarily rare condition, called E. coli syndrome, one that most doctors will never see in their careers. Now, there was only one person who testified at this trial who was an expert on cauda equina syndrome, and that was Dr. Meriwether. He said, in no uncertain language, that this event, cauda equina syndrome, which required action, which required surgery, did not manifest itself until the 24th. And did he also testify that it was unrecognizable that this was a danger at an earlier point in time? No. What he did testify to was that her symptoms were the symptoms of a herniated disc that did not necessarily require anything more than what was done. There was no indication that she had the condition that required the action. Well, there were some indications. The doctor's notes for the people who treated her said so, said she seems to have had this for three weeks. And there was, well, there was that. The doctor who treated her was Dr. Duncan, and he explained those comments. Those were comments in the records, in the medical records, and he said, when I said she has had this for three weeks, that's because when I wrote the statement, it was three weeks after I had seen her. That was not legitimate testimony. Dr. Duncan himself said that on August 27th, when he saw her and immediately recognized that this was cauda equina syndrome, he said her cauda equina syndrome was evolving, and it was medically unlikely that she could have had the condition for three weeks. Well, now that is his testimony. Dr. Merriweather's testimony was equivalent to that. He said this was something that just happened. My general understanding is that you have a herniated disc. It means that there is gel coming out of the disc, right? Right. And eventually, and the way you get this syndrome is if it's in the middle and if it's coming out, it's coming out, and eventually so much comes out that it sits on this nerve. But the fact that it was in the middle and the fact that she was having this numbness and so on would have been a clue that she was in big danger of getting this syndrome.  The notion that a doctor who had seen it would have done nothing seems not inconsistent with what Dr. Steele testified. But that's exactly what Dr. Steele said. He said that under these particular circumstances, a doctor would have done nothing. He said, quote, disc herniations are very common and most get better all the time if nothing is done, and then said irreversible damage and likelihood of permanent disability occurred only a week after her last visit to the clinic. And that was, you know, her visits to the clinic are the only possible source of liability to the government here. And what we're saying is that until and unless there was some indication that what was done at that clinic caused her problem, then there cannot be any liability in this case. And I think that opposing counsel in the section of his brief, when he says here is the evidence we rely on, he relies only on the evidence of Dr. Merriweather, who was the government's expert witness who testified directly opposed to the position that he was taking, and Dr. Duncan, who was the Navy physician who diagnosed the CES, who agreed with Dr. Merriweather on all points. And the only way that plaintiffs could come up with liability was by picking and choosing a few comments that were made by these individuals, by these witnesses, that was in absolute contradiction to the bottom line determinations that they were making. We are also, if you have any more questions on that element of the... Now, you better manage your time. You've got about three and a half minutes left. Do you want to save time for rebuttal? Do you want to make a further point at this time? I want to just make a brief comment about the size of the non-economic damages here. As the court knows, this was a $7.5 million case. It is, I believe, a larger decision by far than anything else that's occurred on Gatlin Rung. Are you still arguing the duplicity issue, or you essentially dropped that might of the case? I don't think that it is as important as the main issue, which is that there are no comparable cases like this anywhere in the country, we think, of this kind of money. The duplicity, the duplicativeness of the award is really only directed to the fact that pain is something that crops up in two of the awards, the pain and suffering award itself and the loss of enjoyment of life. Both of them say she's receiving an award for pain. Second was the loss of sexual pleasure, which appears both in the pain and suffering portion and the physical impairment. But the main issue I think that we're relying on is, as I just said, that there are no other decisions, anything like this, that come up with $6.2 million for the type of award that we have here. This is something that around the country, damage to the spinal cord, severe damage, and we do not disagree that there was severe damage here, does not arise to the level of a $6.2 million purely non-economic damage to the woman who unfortunately suffered this problem. And I would like to reserve the rest of my time. Thank you. May it please the Court. My name is Robert Keogh. I represent the plaintiff's appellees, Mr. and Mrs. Rutledge. The fundamental error in the government's liability argument is that they confuse Cauda Equina Syndrome with a herniating or ruptured disc. Every physician who testified at trial confirmed that Cauda Equina Syndrome is a collection of symptoms. It's not a disease. It's not a herniating disc or herniated disc. It is a collection of symptoms. The government's own expert, Dr. Merriweather, confirmed on cross-examination, and frankly, all we need to look at for our liability and causation arguments is the government's own expert, the cross-examination of Dr. Merriweather, which appears in tab 11 and 12 of our supplemental excerpts. Dr. Merriweather agreed there are four symptoms for Cauda Equina Syndrome, low back pain, numbness in the groin, or what's referred to as saddle anesthesia, bowel or bladder dysfunction, and that the symptoms are bilateral. Dr. Merriweather testified those four symptoms are the gamut of Cauda Equina Syndrome. He also testified, as did other physicians, that not all of the symptoms appear when a patient first presents. When Mrs. Rutledge first came to the Anderson Clinic on July 27, 2004, she had low back pain. The records show she had that. She had numbness in the groin. She checked the red flag box on the record, numbness in the groin. She had bladder dysfunction because she was unable to urinate. She had what was referred to as urination frequency. What urination frequency means is as soon as you finish urinating, you feel like you have to go again. It's not that you're going again. It's a sensation. It's a feeling. On day one, when she appeared at the Anderson Clinic, she had three of the four symptoms of Cauda Equina Syndrome. And remind me, what's the fourth? The fourth is bilateral, and that shows up at the second clinic visit. When the records show, and the records are all contained in tabs 13 through 18, the clinic records show on the second visit she had pain on the left side as well as pain on the right side. What's the most favorable interpretation to upholding the district court's judgment that the plaintiff had CES earlier than when it was diagnosed by Dr. Duncan, I think it was? What's the earliest? The earliest is on the first day. She had three of the four symptoms. Well, is there testimony to that effect, that she had CES on her first visit? Who testified to that? Nobody, right? Actually, nobody said she had CES. What she had was the symptoms that constitute CES. And what the government is saying is that on August 24, when she had the fecal incontinence event, that's when CES appeared. No. We don't know that. You don't know if you have CES unless you take an MRI. The only way you get an MRI for Mrs. Rutledge would have been to see a doctor, get referred for specialist care, and have an MRI done. There was MRIs available on Guam. It was never done until she got to Hawaii a month later. She was denied the opportunity to have care to treat this problem that was obviously developing. It was serious. The symptoms, as Dr. Toll said, were alarming. When you have numbness, numbness is always an alarming symptom. Here, Mrs. Rutledge comes in on the first day to an urgent care clinic with three of the four symptoms, red flag symptoms, of Cauda Coina Syndrome. They don't refer her for specialist care or even to a doctor. She sees a nurse practitioner who she thought was a doctor, but that's another story. She was denied the opportunity to get this care. All of the doctors have agreed also that Cauda Coina Syndrome, which is just a collection of symptoms, it's not a disease, is a surgical emergency. What evidence do we have in the record that during any of those three visits, before she sees a doctor, each time she's seeing someone below the level of a doctor, what evidence do we have here that the proper diagnosis by an experienced medical professional should have been more than just herniated disc, leave it alone, it'll probably get better, and if it doesn't, we can take care of it later? The argument is that a competent medical professional observing these things would have said, listen, it looks like a herniated disc, it's going to be a problem, but we can deal. The evidence is that Dr. Toll, who was the only board-certified emergency medicine, and this is actually an emergency medicine issue case. It's not a surgical case. The government had a neurosurgeon. Once Mrs. Rutledge got the surgery, there was no complaint about the surgery. It was done in the best way that it could possibly be done, and it achieved what it wanted to achieve. The evidence is that Dr. Toll says any mid-level provider, when they see these kind of symptoms, must refer it to a doctor. Wasn't there also, there was an x-ray, and I thought the radiologist said that she should have an MRI, but they never got the radiology to her or to any doctor who could act on it for a long while. Yes, on the second visit, sorry to interrupt you, on the second visit, there was an x-ray done. It took them 12 days. Actually, they never actually gave her the results of the x-ray. She called in and said, I'm still getting worse. I'm in bad shape now. When she came in for the third visit, they told her of the results of the second visit, which was the x-ray was read a day or so later and said, suggest an MRI with these symptoms. The MRI is what would tell whether or not the disc was herniating or to what degree it was herniating, and no MRI was done until a month later, August 27, 2001. So the medical professionals have, within a day or two of the second visit, a recommendation for an MRI? Yes, yes. And the MRI would have revealed the extent of the problem? Yes. Even Dr. Merriweather says MRI is specific for diagnosing Cauda Quina syndrome. He also says in his testimony that what they call sacral sensory loss, which is the same sensation that we're talking about, the numbness, saddle anesthesia, is specific for Cauda Quina syndrome. It is sensitive and specific. Those are his terms. Sensitive means it's important. It's not that it means it's sensitive. He also kept insisting she couldn't have had this syndrome more than at the point of the bowel incontinence because she would have been paralyzed. No, she could have this. She had this. Couldn't have had it for more than 48 to 72 hours. So is it a definitional problem, what we're calling the syndrome, or what? Yes, yes. The syndrome is the symptoms. What we're saying, what Your Honor is saying to me right now is… I'm not saying anything. I'm just saying what he said. She couldn't have had the herniated disc. She couldn't have had the actual ruptured disc as opposed to herniating. When a disc herniates, it slowly protrudes into the spinal column, and this one ultimately bursts. We don't know when. It could have been on August 24 when she had the fecal incontinence. Doesn't herniated disc mean when it bursts? No. Herniation means that it is expanding. Ruptured means it bursts. All we know, because the only time an MRI was given was August 27 in Hawaii, is that by then she had a ruptured disc, and it was spilling acid. Wait a minute now. Are you saying that the disc could have ruptured sometime before? It had to have ruptured sometime before August 27 when the MRI was taken. We just don't know when it ruptured because no MRI was taken. There's no proof of when it ruptured. It was herniating. The disc had to have herniated. Even Dr. Merriweather confirmed that a herniating disc happens gradually, and that's why when we have progression of symptoms, such as what Mrs. Rutledge presented with. Well, that's your theory, that this CES can be, you know, the onset of CES can be gradual. Isn't that your theory? I think that it's everybody's testimony is that CES is something that is gradual. It's progressive in that what the CES is is the symptoms. Countercoinous syndrome is symptoms. It's not a disease. Countercoinous syndrome can be caused by a lot of things. It can be caused by a tumor. It can be caused by a hematoma. It can be caused by, you know, a blood loss of some kind in the spine. Countercoinous syndrome is there is something putting pressure on your sacral nerves, your S1 nerve system, that causes these symptoms. Low back pain, numbness in the groin, bladder or bowel dysfunction. And if it's allowed to continue, as it did in this case, and as Dr. Steele testified, if it had been caught and corrected earlier, there would have been no deficit to Mrs. Rutledge. And that's the testimony that, Your Honor, Judge Fletcher, you've asked of me, is where's the evidence that she would have, if she had been given proper care, that she would not have had this condition. And this was a best trial? Yes. What bothers me about your case is that this all moves pretty fast. And I don't know exactly how fast you're supposed to get appointments in Guam or, you know, the medical facilities with the Navy and so on. But she comes in, I mean, this thing moves from the first appointment with the first symptoms that are kind of a red flag, but they're relatively mild, to the fecal incontinence syndrome. How long between those two? It's pretty short. It's four weeks. Yeah, yeah, it's pretty short. The whole thing is from her first manifestation and her first showing up in the doctor's office to basically the catastrophe is only a month. Well, when she came in, she had had four weeks of back pain already. Right, I understand. But when she comes in, she has, in terms of a symptom that should give you some indication that this is more than just a UTI, is the vaginal numbness on one side. And at that point, it's misdiagnosed. Second point, when she comes in the second time, it's diagnosed properly, at least to the point of, listen, you better go get an MRI. Although, obviously, they've got terrible communication problems because she has to call in, and then they don't schedule it. They didn't tell her to get an MRI, though, for another ten days or something. They never told her until the third visit that there was even a suggestion of an MRI, and then they gave her a routine referral to the orthopedics department, which took her another ten days to even get seen by a doctor then. So they had the information, but they didn't give it to her. Yes. What evidence do we have in the record as to how fast a herniated disc with presenting symptoms of possible CES will ordinarily progress? I don't know the answer to that question. I don't know that there is any evidence of what is ordinary. I think in this circumstance, what we have is what happened with Mrs. Rutledge was alarming in that it's not just the numbness, it is also the bladder dysfunction. Here she comes in saying, I have to press on my abdomen in order to urinate. Those two symptoms are more than UTI. Those two symptoms are a serious surgical emergency that needs to be attended to. Can I just ask a question about the damages? I'm just wondering whether there isn't some overlap here, some serious overlap with regard to, well, first of all, permanent physical impairment. I gather there is some authority for this, but I don't really understand what it means. If you have something like a problem, like you have an arm that breaks or something and you have a permanently broken arm, a permanently not fused arm, you can get damages for that even if it doesn't bother you? Basically, you're getting damages for the past, present, future inconvenience, for past pain and suffering, for a disfigurement and for loss of enjoyment of life. So what's the separate piece for permanent physical impairment? Well, the Guam law, which is what is to be applied here, says that the court is to award damages for all detriment that is sustained as a result of the negligence. The court stated in its award, in its judgment, that it was not intending to be duplicative. It used the definition of non-economic damages from Guam's statute, which had all of the different elements, and she awarded them based on different formulas for each one. She stated in her judgment that she didn't intend this to be duplicative. The government has raised this argument for the first time on this appeal. The trial court was never given the opportunity to address whether or not her award was duplicative at the trial level on their motion for new trial. It was never raised. We cited the case, the In Re E R Furgard case, which is a 1989 Ninth Circuit case, which sets the standard is that for something raised for the first time on appeal, the standard has to be that the trial court be given an opportunity to address the issue below. Judge Fedeco-Gatewood sat through 17 days of trial, hearing 14 witnesses. She has plenty of experience on Guam in every facet of practice that you can imagine. She issued this award based upon Guam law, relying upon the only Guam case that could give any guidance to her, and used her best judgment. Unless the government can show passion or prejudice, which is Guam's standard, this award is not subject to being reversed.  Thank you, Your Honor. Let's hear from the government who's saved a little time. The main issue I would like to address, Your Honor, is what Judge Fletcher, what you said, or what you ask opposing counsel as to when the onset of CES occurred. Once again- I'm not sure I asked that. Well, I think you said- I didn't answer that, though. Was it something that came on gradually, or was it something that occurred as a quick event? And he indicated that it was something that came on gradually. That is in opposition to all of the testimony that was presented at trial. Judge Merriweather said that the incontinence event on August 24th, which was a week after the last time she was at the clinic, was a dramatic sign that CES, quote, is about to come upon you and you need to be seen, end quote. And he said that CES is almost always a sudden event, and, quote, like a blowout on a tire at 80 miles per hour on a freeway. Yeah, but that's not the question. The question is, given the symptoms that she presents, what action should have been taken to diagnose the problem and to alleviate the problem in order to avoid the blowout on the tire? And their argument is, and they've got enough evidence that shows, the medical evidence was there pretty early on. There was ample opportunity to figure out what it was, and they didn't do it. But that was evidence, Your Honor, of a seriously herniated disc, not of CES, and to say that you have to act in response to CES when CES has not yet occurred is not a basis for decision. This case is a semantic argument. Okay. Thank you, Your Honor. Thank both sides for their argument. The case Rutledge v. United States is now submitted. We will be in recess. There's an event that will take place here in the courtroom shortly. We will return. All rise.
judges: Tashima, Fletcher W. , Berzon